J-S45031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SHAUN H. FOLKERTS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NANCILYN A. FOLKERTS | : | |
| | : | |
| Appellant | : | No. 1134 MDA 2025 |

Appeal from the Order Entered July 21, 2025
In the Court of Common Pleas of York County Civil Division at No(s):
2022-FC-000452-03

BEFORE: STABILE, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED FEBRUARY 06, 2026**

Nancilyn A. Folkerts ("Mother") appeals the order entered in the Court of Common Pleas of York County, which, *inter alia*, decided custody of Mother's and Shaun H. Folkerts's ("Father") two youngest children, K.A.F. (born 2018) and N.C.F. (born 2019) ("Children"). The court granted Mother primary physical custody of K.A.F. and granted Father primary physical custody of N.C.F., with alternating primary custody on weekends for both parents with both Children and further granted Mother's petition to relocate within the Commonwealth. On appeal, in ten different issues, Mother challenges various aspects of the court's order, including, *inter alia*, the court's decisions on: (1) the analysis of the relocation and custody factors as to Children; (2) separation of Children between Mother and Father; (3) the

_____

[*] Retired Senior Judge assigned to the Superior Court.

J-S45031-25

relocation benefits to Mother and Children—considering the benefits of relocating with both Children—as compared to Father's interests and objection to relocation; and (4) the allocation of time at trial as between Mother and Father for presentation of their respective cases. After review, we affirm.

The trial court set forth the facts of this case as follows:

At issue is [Mother's] appeal of matters related to a custody trial held over seven full or partial days on March 26, March 28, April 15, April 23, May 2, May 30, and July 9 of 2025. This was by far the longest custody trial in terms of timespan and number of courtroom hours that this judge has ever presided over out of probably close to one hundred trials over the last four years.

\* \* \*

The several legal matters involving these parties began to erupt[1] when the eldest child of these two parents[, M.F. (born 2007),[2]] disclosed she had been sexually abused by Father when she was alone with him on camping trips, including trips outside of York

---

[1] This case is a continuation of a tortured history of intense acrimony between the parties. **See** Trial Court Opinion, 7/28/25, at 29 ("The court could write a book about the conflict in this case."). The trial court expressly found "that it is impossible for these two parents to agree on parenting. The court makes a further finding that this is unlikely to change in the foreseeable future, and likely not ever. That is a significant basis for the split in legal and physical custody in this case." **Id.** Further, the trial court summarized Mother's and Father's relationship with each other as follows:

Experience has shown over the last several years, and quite honestly even before court involvement, that there is no higher value for either of these parents than to try to cause misery, hurt, and financial harm to the other parent. They will use their children as props and pawns as they each put their own need to hurt the other parent well ahead of the children, time and time again.

Trial Court Opinion, 9/15/25, at 18.

[2] M.F. is not subject to the custody order in this case.

- 2 -

County and outside of the Commonwealth. This disclosure was triggered by her younger sister[, K.A.F.,] coming home from a camping trip with [F]ather and describing sleeping naked in the bed with [F]ather as well as showering with him. [K.A.F.'s] disclosure [came about when] Mother had [] M.F. question [K.A.F.] outside Mother's presence. M.F. then made her own disclosure to Mother that Father had inserted his finger into her vagina on four separate occasions[.]

M.F. testified that Father inserted his finger in her vagina "for a few minutes." These statements from M.F. are described in the Superior Court's opinion related to an appeal of a protection from abuse [("PFA")] order, [docketed in the Superior Court at 122 MDA 2023 and 123 MDA 2023, and] dated August 29, 2023. [. . .] There have been no allegations of sexual abuse involving the parties' son and youngest child, [N.C.F. . . .]

Criminal charges were ultimately filed in York County against Father. His charges went to trial. A multiple day jury trial was convened in York County with the [Honorable] Kathleen J. Prendergast presiding during December of 2024. The conduct considered at that [criminal] trial [consisted of] only the abuse allegations [that] could be linked to York County, which ultimately included an episode alleged to have occurred on a couch in the family's home. Father was acquitted on all charges by the jury.

The custody trial, by agreement of the parties, had been stayed pending the disposition of the criminal matter. The custody matter then was able to proceed to trial on the dates and times enumerated above, although the court did not initially schedule all of those dates for this trial. The attorneys for the parties asked for and received two days for the trial, which was initially scheduled by the court in an order issued on January 22, 2024.

After Father's acquittal in the criminal case, the [custody] trial was rescheduled for March of 2025. As the trial exceeded the two[-]day estimate, the court looked for and blocked off additional dates. The court took witnesses out of order to allow accommodation of scheduling needs. As a result, this trial proceeded in a somewhat unorthodox manner[.]

Trial Court Opinion, 9/15/25, at 1-4 (footnotes omitted).

After the custody trial, which trial included a hearing on Mother's February 21, 2025 petition to relocate, the court issued its decision, as stated above, on July 21, 2025.[3] Mother sought reconsideration on August 20, 2025, which this Court deems denied for the purposes of this appeal.[4] Mother appealed on August 15, 2025, but did not simultaneously file the required statement pursuant to Pennsylvania Rule of Appellate Procedure 1925.[5] **See** Pa.R.A.P. 1925(a)(2)(i). The trial court then ordered Mother to file such a statement by September 11, 2025. **See** Order, 8/21/25. Mother complied, and the trial court thereafter addressed her claims. **See** Mother's Pa.R.A.P. 1925(b) Concise Statement, 8/25/25; **see also** Trial Court Opinion, 9/15/25.

_____

[3] Although Mother's appeal dually challenges the court's rulings on the relocation and custody modification petitions, her appeal is properly before us because the trial court's order disposed of both at once. **Cf. S.S. v. T.J.**, 212 A.3d 1026, 1034 (Pa. Super. 2019) (declining to address prior grant of relocation in appeal from later filed custody modification petition because "a party may not use an appeal from the disposition of a petition for modification of custody as a substitute for an appeal from an underlying order for the purpose of relitigating matters pertaining to the underlying order").

[4] On August 22, 2025, the trial court purported to grant in part, and deny in part, reconsideration of the custody order, but did not timely grant such reconsideration because it needed to do so no later than August 20, 2025. **See** Pa.R.A.P. 1701(b)(3)(ii) (trial court may grant reconsideration within thirty days of entry of relevant order). As the court did not properly grant reconsideration, we deem it denied for our purposes and find that Mother rightly appealed the July 21, 2025 order.

[5] We decline to find waiver based on Mother's failure to comply with that portion of Rule 1925. **See In re K.T.E.L.**, 983 A.2d 745, 747 n.1 (Pa. Super. 2009) (appellant's failure to simultaneously file a Rule 1925(b) statement did not result in waiver of all issues for appeal where appellant later filed statement, and there was no prejudice from late filing).

In her appellate brief, Mother presents ten issues for our review, which she restates precisely as she raised them in her Rule 1925 statement:

I.      Whether the trial court committed an abuse of discretion or an error of law regarding its analysis of the custody factors in total relating to the best interests of the children?

II.     Whether the trial court committed an abuse of discretion or error of law by stating the ultimate determination of custody for the parties['] two youngest children[, K.A.F. and N.C.F.,] would be based upon the court's determination regarding whether or not Father engaged in sexual abuse of the parties' eldest child[, M.F.?]

III.    Whether the trial court committed an abuse of discretion or error of law when separating elementary school[-]aged and similar aged children without considering the bond between the children themselves, N.C.F. and Mother, and the bond between both [C]hildren and their older sibling, [M.F.,] who resides solely with Mother[?]

IV.     Whether the trial court committed an abuse of discretion or error of law by entering an order providing for primary physical custody of N.C.F. with Father, thereby denying Mother's relocation request as to only one child[, N.C.F.?]

V.      Whether the court committed an abuse of discretion or an error of law by determining the relocation benefits to both Mother and both [C]hildren were not sufficient to outweigh Father's interests and his objection to the relocation?

VI.     Whether the trial court committed an abuse of discretion or an error of law in determining that there are not adequate substitute partial custody arrangements that would preserve the relationship between Father and N.C.F. given the schedule of custody put in place for Father and K.A.F.[?]

VII.    Whether the trial court committed an abuse of discretion or an error of law regarding its analysis of the custody factors relating to the emotional well-being, emotional safety, and relationship between Father and the youngest children[?]

VIII.   Whether the trial court committed an abuse of discretion or error of law by failing to consider testimony of [C]hildren's

current and court[-]ordered behavioral therapist as evidenced by the opinion issued by the court following trial[?]

IX. Whether the trial court committed an abuse of discretion or error of law by allowing Father's case in chief to encompass the majority of the available time for trial, thereby leaving limited and inadequate opportunity for Mother to present intended witnesses and testimony[?]

X. Whether the trial court committed an abuse of discretion or error of law by failing to provide for telephone contact with the non-custodial parent and [C]hildren[?]

Mother's Brief, at 6-8 (unnecessary capitalization omitted).

Prior to reaching the merits of Mother's claims, we find that Mother's first issue is not preserved for our review as it was too vague for the trial court to decipher the specific claim of error or abuse of discretion alleged, and we agree that such vagueness is fatal to her claim. *See **In re L.M.***, 923 A.2d 505, 509-10 (Pa. Super. 2007) (applying Rule 1925 waiver standards in family law context); *see also **Kanter v. Epstein***, 866 A.2d 394, 400 (Pa. Super. 2004) (noting that Rule 1925 statement too vague for trial court to identify issues raised on appeal is equivalent to no statement filed at all, and even if trial court correctly guesses issues raised on appeal and writes opinion pursuant to that supposition, issues remain waived); Pa.R.A.P. 1925(b)(4)(ii) ("[Rule 1925] Statement shall concisely identify each error that the appellant intends to assert **with sufficient detail to identify the issue to be raised for the judge**") (emphasis added); *see also* Trial Court Opinion, 9/15/25, at 4-5 ("Without being disingenuous, the court has very little idea what is being appealed. [Mother] seemed to be displeased generally with the outcome of

the trial[. . . .] However, in the absence of some particular area [where Mother] specifically identifies a particular error of law, it is difficult for the court to respond meaningfully in this opinion to the claim that it made an error of law[ or] abuse of discretion[.]").

Next, we conclude that Mother has abandoned her sixth and tenth claims on appeal for failure to include in her brief any argument relating to those two issues. *See In the Interest of D.N.G.*, 230 A.3d 361, 363 n.2 (Pa. Super. 2020) ("[a]n issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived") (citation and quotation marks omitted).

Further, we observe that Mother's brief fails to comply with several rules of appellate procedure. *See* Pa.R.A.P. 2101 (appellate briefs must conform in all material respects to briefing requirements in Pennsylvania Rules of Appellate Procedure or appeal may be quashed or dismissed). Specifically, Mother fails to adhere to the requirements of Pennsylvania Rule of Appellate Procedure 2119(a), where the argument portion of Mother's brief is separated into only three parts, but she purports to raise ten issues for our review on appeal. *See* Pa.R.A.P. 2119(a) (stating argument shall be divided into as many parts as there are questions to be argued and shall have, at head of each part, particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent). Also, Mother fails to identify where she has preserved each of her specific claims for review. *See* Pa.R.A.P. 2119(e); *see also* Pa.R.A.P. 2117(c). Nevertheless, we will address Mother's

contentions to the extent we can meaningfully review her claims. *See In re L.V.*, 209 A.3d 399, 412 (Pa. Super. 2019) ("Although Mother's brief is deficient in some instances, Mother provides some citation to legal authority and does not prevent meaningful review.").

On the merits, as to each of Mother's issues on appeal, our standard of review is well-settled:

> In reviewing a custody order, our scope is of the broadest type[,] and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted). Further, when relocation is at issue, the court should consider relocation and custody within the same "best interest" analysis. *See S.S. v. K.F.*, 189 A.3d 1093, 1098 (Pa. Super 2018) ("A court should avoid dissociating the issue of primary custody from the issue of relocation[] and should instead decide the two issues together under a single umbrella of best interests of the children.") (citation and quotation marks omitted). Although accorded great weight, the trial court's credibility determinations must be supported by the record. *See In re Custody of Pearce*, 456 A.2d 597, 599 (Pa. Super. 1983). Only where

it finds that the custody order is "manifestly unreasonable as shown by the evidence of record will an appellate court interfere with the trial court's determination. Therefore, unless [there is] a gross abuse of discretion, an appellate court will not interfere with [an] order awarding custody." ***Swope v. Swope***, 689 A.2d 264, 265 (Pa. Super. 1997) (citations, quotation marks, and ellipsis omitted).

The primary concern in any case of custody, including when considering relocation, is the best interests of the child. ***See S.S.***, 189 A.3d at 1098. The determination of what is in a child's best interest is decided on a case-by-case basis, in light of all factors that legitimately affect the child's physical, intellectual, moral, and spiritual well-being. ***See Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006).

As to Mother's relocation petition, the Child Custody Act, 23 Pa.C.S. §§ 5321-5340 (the "Act"), governs judicial analysis and provides specific relocation factors in Section 5337(h) for the court to consider. ***See*** 23 Pa.C.S. § 5337(h). If the proposed relocation results in a change in custody, the court must also consider the custody factors in Section 5328(a).[6] ***See A.V. v. S.T.***, 87 A.3d 818, 822-23 (Pa. Super. 2014). "Several of the factors of Section 5337(h) are encompassed, either directly or implicitly, by the custody factors of [S]ection 5328(a)." ***S.S.***, 189 A.3d at 1098 (citation, quotation marks, and

---

[6] The Section 5328(a) custody factors have been amended since the court's July order. ***See*** 23 Pa.C.S. § 5328 (Act of June 30, 2025, P.L. 18, No. 11, § 1, effective Aug. 29, 2025).

footnote omitted). Although an assessment of each factor is mandatory, "it is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *E.B. v. D.B.*, 209 A.3d 451, 460 (Pa. Super. 2019) (citation omitted). Also, "[i]n expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013).

Mother purports to address each of her numbered claims 1, 3, 4, 5, 6, and 7 in her combined first portion of her argument, which we have already noted violates Rule 2119(a).[7] *See* Mother's Brief, at 17-51. In any event, as to these claims, we have already deemed her first and sixth issues waived.

In her third issue, Mother argues that the trial court did not consider the bonds between Mother, M.F., and Children. Specifically, Mother claims that the trial court erred in finding that Children are not bonded to one another and to M.F., especially insofar as: (1) M.F. testified that Children had a normal sibling relationship with each other; (2) M.F. lives with Mother; and (3) N.C.F. stated he did not like visits with Father when K.A.F. was not present. *See*

---

[7] This first portion of Mother's argument section is rambling and contains little indication of which claims relate to which issues she raises. Further, although she does not expressly state her intention to do so, Mother includes argument relating to her eighth claim on appeal in this portion of her brief—as discussed in greater detail within the body of this decision—and Mother does not otherwise argue her eighth claim anywhere else in her brief.

Mother's Brief, at 42, 45. Mother complains that the court did not analyze why it separated Children. *See id.* at 38. Further, Mother states that the record supports finding that N.C.F. is closely bonded to Mother, and he has never been out of Mother's care overnight, including when Mother and Father lived together. *See id.* at 45-46.

As to Mother's fourth issue, Mother asserts that the court erred in granting primary physical custody of N.C.F. to Father. Specifically, Mother argues that the court's assessment of N.C.F.'s enthusiasm in resuming time spent with Father, after minimal time spent together, does not support the grant of primary custody of N.C.F. to Father. *See id.* at 19-20. Mother complains that Father failed to make efforts to see N.C.F. for eleven months. *See id.* at 21. Mother contends that the record demonstrates that she can care for all three of the parties' children. *See id.* at 45. Moreover, Mother notes that there is nothing in the record supporting a determination that it is not in N.C.F.'s best interest to relocate with Mother when it is in K.A.F.'s best interest to do so. *See id.* at 49.

In support of her contentions, Mother relies on our decisions in *Pilon v. Pilon*—without providing additional specific citation and without including that case in her table of citations, in violation of the rules of appellate procedure, *see* Pa.R.A.P. 2174(b), *see also* Pa.R.A.P. 126(a)[8]—and *Witmayer v.*

_____

[8] In connection with our previous discussion, this portion of the argument violates each of subsections (a), (b), (c), and (e) of Rule 2119. *See* Pa.R.A.P. *(Footnote Continued Next Page)*

- 11 -

*Witmayer*, 467 A.2d 371, 376 (Pa. Super. 1983) (noting that "continuity and stability are important elements in a young child's emotional development" and "absent compelling reasons to the contrary, it is best for siblings, even half-siblings, to be raised together"). Mother concludes that the trial court failed to provide "compelling" reasons to separate Children's custody as between the parents given Children's status as siblings and that the parties' conflict between themselves and the fighting between Children do not amount to such compelling reasons. *See* Mother's Brief, at 41, 49-50.

In her fifth issue, Mother contends that the court failed to properly weigh the benefits of relocation to both Children and to Mother as compared with the benefits to Father. Specifically, Mother maintains that the court abused its discretion in weighing this factor evenly as between Mother and Father and that the factor does not support the denial of relocation as to N.C.F., especially where relocation would be to N.C.F.'s benefit. *See* Mother's Brief, at 19, 41. Mother argues that she is the only parent who attended parent-teacher conferences and ensured that Children were enrolled in and attended therapy. *See id.* at 37. Mother also argues that the court did not analyze why it separated Children. *See id.* at 38. Moreover, Mother highlights that she has a significant number of family members who could help care for Children upon her relocation. *See id.* at 40. Mother notes that she is gainfully employed

_____

2119(a)-(c), (e). Nevertheless, based on her argument, we divine that Mother cites to our decision in *Pilon v. Pilon*, 492 A.2d 59 (Pa. Super. 1985), and we are able to review the claim.

- 12 -

and that Father does not work and that he intends to remain a stay-at-home parent. *See id.*

In her seventh issue, and most developed within this first portion of her argument, Mother contends that the court failed to properly consider the emotional well-being of Children. Mother argues that Father failed to provide any evidence that Father supported Children's well-being or would do so in the future. *See* Mother's Brief, at 21. Further, Mother argues that Father failed to involve himself in important matters in Children's lives and failed to seek information relating to Children's therapist. *See id.* at 21-22, 34. Mother also alleges that Father made conflicting statements about Children's need for behavioral and trauma therapy. *See id.* at 22.

In further support of her position, Mother relies on the court's findings, and the recommendations and conclusions of Children's guardian *ad litem* (GAL), Sydney Benson, Esquire, that Father should seek therapy and that he lacked insight into his own behaviors and the negative impact of those behaviors on Children; therefore, Father is unable to ensure the mental and emotional safety of Children. *See id.* at 22-23, 47. Further, Mother points to Father's supervised visits with Children and what the GAL characterized as Father's use of emotional bartering and his assigning emotions to Children. *See* Mother's Brief, at 26, 30. Mother complains that the court failed to consider these conclusions by the GAL, especially insofar as the GAL found that Father "'took the opportunity to exploit the exhaustion and frustration

that [M]other was clearly experiencing at the expense of the child.'"[9]  **_Id._** at 27.

Mother also emphasizes that Father forbade his own mother from contacting Children for over a year until he required financial support and, also, that Father told Children that they would not be able to see Father's cat unless Children visited with him at his home.  **_See id._** at 32.  Father also allegedly employed other psychological and emotional manipulation during supervised visits with Children, which involved for instance, pressuring Children into gifting art to Father that Children created.  **_See id._**  Mother also complains that Father would bring gifts for Children to those visits, in contravention of the trial court's orders. **_See id._** at 33.  Mother's complaints of Father's emotional manipulation extend to her explanation of why Children's behavior deteriorated while in her care.  **_See id._** at 46.  Mother asserts that she is the only parent who attended parent-teacher conferences and ensured that Children were enrolled in and attended therapy.  **_See id._** at 37.  In support of these claims, Mother also invokes her eighth issue on appeal,[10] that the court failed to consider any testimony by Children's therapist.  **_See id._** at 27.

---

[9] Contrary to the rules, **_see_** Pa.R.A.P. 2119(c), Mother fails to cite to the location in the record where this quote is located.  **_See_** Mother's Brief, at 27. Nevertheless, in our review of this appeal, we have located the GAL's statement in the record, among over one thousand pages of testimony.  **_See_** N.T. Trial, 3/26/25, at 48-49.

[10] **_See_** n.7, **_supra_**.

Also, Mother contends that she attempted to share appropriate techniques for dealing with Children's emotional needs with Father and, further, emphasizes that no professional characterized Mother as dismissive of Children's emotional needs. *See id.* Mother complains that many of Father's actions have been made at Children's expense, including when he recorded video of Mother's struggles in parenting Children—evidencing Father's disregard for Children's emotional needs at those times in favor of his own. *See id.* at 28. Mother further notes Father's stated belief that he has no shortcomings as a parent, and his answer that the only thing he would have changed was to leave the relationship with Mother sooner. *See id.*

Moreover, Mother points to Father's behavior in contacting M.F. during a brief lapse in a PFA order as evidence of his disregard of Children's emotional well-being. *See id.* at 29. Mother contends that Father's open disregard and refusal to call K.A.F. by her given name instead of a nickname he assigned to her, against K.A.F.'s wishes, is contrary to the child's well-being. *See id.* at 30. Mother notes that the GAL suggested monetary sanctions for Father's continued refusal to abide by K.A.F.'s wishes. *See id.* at 31.

As to credibility, Mother takes issue with the court's finding that Mother was dishonest at a prior hearing regarding the behaviors of Children while in Mother's custody and blames Father for any poor behavior. *See id.* at 47. Specifically, Mother contends that, contrary to the court's findings, she did not refute that Children were not always well-behaved while in her care when, for instance, she acknowledged N.C.F. was disruptive in school and caused

- 15 -

destruction. *See id.* at 48. Mother also notes that, despite the findings by the court regarding her difficulties parenting, Father has also struggled to discipline Children. *See id.* Nevertheless, after our review of these claims, we conclude that Mother is not entitled to relief on any issue she presents in her first portion of her argument.

The trial court analyzed each of Mother's issues in turn, setting forth its analysis of Mother's third issue on appeal as follows:

> To begin with, the oldest child, M.F.[,] is to be attending college this fall according to the testimony at trial. Whether she has left already or is soon to leave, the practical fact is that she is not actually living full-time with Mother and would not be there full-time to maintain a relationship day-to-day with her brother, [N.C.F.]

> Mother works full-time during conventional working hours. She had to move in part because her remote work conditions were being altered, requiring her to spend more time in the office in person. [N.C.F.] would be with a child care provider or preschool during most daytime hours. Much to Mother's annoyance, Father does not work[] and would be available to spend considerably more time with [N.C.F.], depending on the preschool arrangements. Mother also may maintain a relationship with [N.C.F.] during her weekend visits with him on the weekends when she has both [Children] in her care. Father also has a bond with [N.C.F.], and both parents cannot be accommodated to the extent they desire. That is the nature of the beast in custody court.

> As to [K.A.F.], she will, as the court intended in its custody order, be with her brother every weekend, although she will be rotating weekends between Mother and Father. The court intentionally structured the weekends of [C]ildren's visits with the respective parents in a manner that made sure [C]hildren would have every weekend together for the precise reason that the court wanted them to be able to maintain and hopefully improve their relationship with one another. Given the exceptional level of conflict in this case and the tradeoffs the court had to make to

- 16 -

reduce the opportunities for the parents to manufacture further conflicts with each other to the detriment of their children, this option was the least-damaging one the court believes it could implement.

Trial Court Opinion, 9/15/25, at 7-8 (record citation omitted). Further, the

trial court had previously explained its bonding analysis between Children as

follows:

> The court is in the strange position to be advocating for separating the youngest siblings in this case. [. . . Although] Children do not appear to have a *per se* negative relationship with one another, they do not have a well-developed bond. They are both quite challenging behaviorally for reasons that are not their fault, yet they do physically fight. The court seeks to allow medical interventions to gain traction while reducing the likelihood that the children fight with one another. It is the court's hope that these parents will be better able to manage themselves and [C]hildren with a shared load. Separating [C]hildren during [the] week is something th[e trial] court has never done, but the facts of this case justify to this court this exceptional step. [. . . S]eparation in this manner serves the best interests of [C]hildren. The court concludes that sibling relationships favor neither party[,] and the court gives sibling relationships a minimal weight, which is this court's signal that they should not spend all time together and that other concerns are paramount. [Children] will continue to see each other regularly, mitigating [the] adverse effects of separation.

Trial Court Opinion, 7/18/25, at 24-25.

Next, the court evaluated Mother's fourth issue on appeal as follows:

> This was a custody trial with a relocation component. What Mother seems to misapprehend is she was allowed to relocate following the court's analysis of the relocation factors. The court then proceeded to a standard custody analysis because custody itself was also at issue in this case independent of the relocation issue. The court declined to award [Mother] majority physical custody of [N.C.F.] for the reasons the court set forth at length in its opinion in support of the custody order following an analysis of the sixteen custody factors.

Mother evidently feels if she was allowed to relocate that she should retain the same custody rights. The two were analyzed separately by the court because they are two separate questions. Mother prevailed on being allowed to relocate as to all children. She did not get the outcome she wanted on the general custody issue following approval of her relocation. For what it is worth, had mother moved into a house five miles down the road from Father instead of further across the Commonwealth, the schedule of physical custody in this case would have been identical.

Trial Court Opinion, 9/15/25, at 9.

As to Mother's fifth issue, the trial court found as follows:

This is essentially the same argument as in [issue 4], above. The court had to resolve two matters. First, the relocation—can Mother move without having to experience adverse consequences to her custodial rights? Yes, she can move. She won. Second, what structure should there be to govern the schedule of physical custody between these parents with the two younger children after considering the sixteen custody factors? The court's decision on that second matter was not driven in any way by Mother's relocation. Had there been no relocation issue in this case at all, the court's decision on the schedule of physical custody for each child would be exactly the same and for the reasons given in the opinion in support of the custody order and the reconsideration decision.

*Id.* at 10.

On Mother's seventh issue, the trial court relied on its written opinion in support of the custody order, *see id.* at 11, in which the court reasoned as follows:

To begin with, the court finds that the most[ ]compelling pieces of evidence apart from testimony in this case to be Mother's exhibits 9 and 11, which were two recordings offered by Mother during the final day of trial. These recordings were made at a point in the parties' relationship **before any allegation of sexual impropriety by Father**. This was merely the "background noise" before the explosive allegations of sexual misconduct sent the level of conflict, hatred, and revenge-seeking in this case even further into the stratosphere.

- 18 -

The two recordings are of one more or less continuous verbal battle between Mother and Father. Mother's testimony was that she made the recordings to share with her counselor to develop strategies to assist her in deescalating. Her decision to remain in the room to record the exchange and not to remove the children from it is incomprehensible to the court. Father's behaviors on display during the recording are similarly incomprehensible.

Listening to these recordings in court was one of the most emotionally taxing experiences this court has endured taking since being sworn in on January 3, 2022. This is not a particularly lengthy period of service for a trial court judge, and perhaps more grim material lies ahead someday, but at least to this point, these two pieces of evidence were remarkable in their intensity and in their impact on this jurist.

During the recording, Father is berating the teen child for a variety of grievances, including failing to meet his emotional needs. [Father] is the ostensible adult in the relationship. It goes without saying that an adolescent child is not responsible for meeting the emotional needs of an adult parent.

Father also makes it clear [the child] deserves to suffer[] natural consequences for being late for a soccer practice. In the abstract, this is perhaps an appropriate parenting strategy. What was actually delivered was repugnant, vile, and grossly unacceptable.

Father hurls abuse at [the child] for an extended period of time in a completely inappropriate manner. He occasionally demands the child participate in questioning in a tone which [] cannot adequately [be] described as dysregulated and uncivil. It must be heard to be believed. It was thoroughly reprehensible.

The court took a recess in the middle of the testimony due to the overwhelming impact of hearing the toddler-aged children asking for a parent while the parents ignore them and continue to egg each other on during this circus. Neither parent stops what they are doing in order to prevent psychological harm to any of the three children. Each parent evidently felt completely entitled and justified in continuing, without apparent concern for the children. Nobody walks away. Nobody leaves.

Years later, and during the custody litigation which ensued in the aftermath of the subsequent sexual abuse disclosures, the parents argued extensively and without much self-awareness about whose parenting resulted in the children having serious behavioral

- 19 -

issues. The answer to the court after hearing these examples of the parenting of these two was clearly "both parents."

These two recordings, and the other slightly less awful recordings presented by each of the parents, represent the baseline environment of continuous overt hostility and conflict that these children were subjected to by these two parents for years.

After the disclosures of sexual impropriety, the one saving grace was that the parties finally separated due to the [PFA] order. Had the parties been brought into a dependency proceeding and those recordings had been presented during an adjudication, in all likelihood[,] this court would have placed the children with a fit and willing relative or a foster family.

When the parties separated, the battlefield moved from the living room to the courtroom, and it went on and on.

\* \* \*

Unquestionably, there was verbal, emotional, and psychological abuse by both parents toward the children[.] The record is replete with examples. Exhibits 9 and 11 were merely the most egregious examples.

\* \* \*

The court's concerns regarding the safety of [C]hildren relate to their mental and emotional safety. The court was unconvinced that Mother grabbed [N.C.F.] by the hair and [dragged] him during a period of frustration with him. The video was ambiguous in the evaluation of the court. The court has noted above that it does not find the allegations of sexual abuse against the middle or eldest child credible. The parties have separated from one another. While the parties may continue to litigate[,] and will certainly continue to struggle in coparenting, at least these struggles will not necessarily involve the children at the ringside seats. Prospectively, the court believes they are safe from the parents. The younger two children have considerable unmet emotional needs and are prone to reactive behaviors, including physical confrontations. It is the opinion of the court that it would be beneficial for them to be separated most of the time until such treatment can gain traction which would result in the mitigation of these behaviors. This factor favors neither party and the court gives it substantial weight. To the contrary, this factor in the court's estimation strongly suggests separating the children for

the majority of the time with possible future reintegration as their behaviors abate. The court also has concerns about Mother being able to manage both younger children, as these behaviors manifested during a period that was largely following the removal of the children from Father's care and therefore on her watch.

\* \* \*

The court next considers [. . .] which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs.

Both parties struggle significantly in providing a loving, stable, consistent, and nurturing milieu for the children. Their parenting styles, personalities, and struggles with emotional regulation have been considerable barriers to creating a nurturing environment, though they may be better now that they will parent separately and with a division of labor. The factor favors neither party and the court gives it moderate weight.

[As to which party is likely to attend to Children's daily physical, emotional, developmental, educational, and special needs, b]oth parents have struggled mightily to provide for the emotional needs of the children. They are mostly capable parents as to the balance.

As for the parties meeting the educational needs of Children[,] Mother claims that Father would not attend the regular school[-]related functions such as parent teacher conferences. [Mother's] testimony was that anything regarding education she handled almost exclusively. [] Children have well[-]documented behavioral issues and act out in extreme ways. Even when the court was interviewing K.A.F.[,] she demonstrated a very willful personality. The court[,] based on its observations[,] believes that a reasonable portion of this behavior is the result of Children absorbing the behaviors modeled by the parents.[ ]To be fair, Mother has had [Children] for most of the last three years, and she was the most recent ["]cook in the kitchen.["] This makes it difficult to say that either parent could reasonably meet[] the needs of Children in this regard as [the parents] appear to be the source of at least some of these behaviors. The factor favors neither party and the court gives it moderate weight.

Trial Court Opinion, 7/18/25, at 1-9, 16-18, 27-28 (emphasis in original; footnote omitted).

The trial court further explained its view of each parent's ability to attend to Children's needs in the Rule 1925(a) opinion:

This court started its discussion of this case in the opinion supporting the custody order by reflecting on the horrific nature of the audio recording of Father, Mother, and M.F. [] with [both C]hildren evidently wandering around in the background, occasionally asking for attention. Father was berating M.F. for typical and not particularly egregious adolescent misbehaviors. He would turn from berating the child to doing the same with Mother. Mother was more interested in recording it all for her own use than protecting her adolescent daughter or the younger two children who were evidently witnesses to this slow[-]rolling catastrophe of parenting. Mother herself was recorded in the presence of the children during moments when she was considerably emotionally dysregulated, also while Father was not intervening himself.

Trial Court Opinion, 9/15/25, at 19 (footnote omitted).

As to Mother's eighth claim, the court considered the merits of the issue as follows:

The court considered a wide variety of evidence about these children and the parents, including the evidence of a professional parenting supervisor who was questioning why he was supervising visits. The court considered videos and recordings offered by Mother and Father showing interactions between [C]hildren and the parents, including ones where Mother was melting down or obviously frustrated, especially by [N.C.F.] While the court did not conclude that [Mother] grabbed [N.C.F.] by the hair, Mother's interactions with [C]hildren often involved significant emotional dysregulation on her part. [N.C.F.] had considerable behavioral concerns at school while under Mother's care when Father was out of the home and Father could not be responsible for [N.C.F.'s] behaviors for a period of years. There were considerable behavioral issues at supervised visits to the point where one supervisor described them as among the worst children she had ever seen. [N.C.F.] had significant, violent outbursts in school while solely under Mother's care for a period of years. Mother lied while under oath in a courtroom about [Children's] behaviors [] when in her care. The court finds [Mother] to be generally

- 22 -

unreliable as a witness and especially unreliable as it relates to the behaviors of [C]hildren and her ability to manage those, so it is unclear to the court why it should assess information she may pass along to experts outside of court as being any more credible than what she passed to the court from the witness stand where she was potentially subject to felony charges of perjury for lying.

Considerable and weighty evidence suggested Mother's parenting of [C]hildren was far from ideal. Separating [C]hildren, who also physically fight, is the least bad option under the circumstances. Finally, the court's decisions as to a custody schedule are not outsourced to child psychologists or to parenting evaluators, so long as the court can point to substantial evidence to justify its decision. The court respectfully submits it has done so.

Trial Court Opinion, 9/15/25, at 11-13 (record citations omitted).

The trial court also explained why it found Mother to lack credibility in the opinion it issued in support of its order:

There have been many subplots and related hearings, including one in which the court concluded that Mother was thoroughly dishonest when she denied that the younger two children displayed adverse behaviors when under her care despite having severe and persistent behavioral issues in school. This poor decision by Mother considerably affected the court's perception of her credibility in this case.

Trial Court Opinion, 7/18/25, at 6. The court further clarified its credibility determinations and their aggregate effect on its decision:

The court does not conclude that it was proved by a preponderance of evidence that there was sexual abuse by Father of either of his daughters. This court heard the [PFA] case and did not have the benefit of hearing Father's testimony and other evidence in his [criminal] defense. The court formerly considered the testimony of [M.F.] fully credible in the absence of being challenged as to a narrative which evolved, allegations which were largely disproved, and a collateral witness (Mother) who later revealed herself to be thoroughly dishonest to the court about a material matter. The court no longer regards Mother or [M.F.] as reliable reporters of events. This is not to say that the court greatly favors Father as a witness, as he frequently suffers from

an inability to see alternative perspectives. Both parents appear to have significantly distorted viewpoints.

\* \* \*

[T]he court had the benefit of extensive observations of the parties in court. Their demeanors toward one another and other witnesses, and by turns the angry, petulant, or childish faces, gestures, and sounds they made throughout the proceedings[,] which often required redirection by the court. The court had hours and hours of opportunity to observe each of them and the naked, unabashed hatred and revulsion each expresses toward the other. Of the two, Mother was far less able to conceal her anger toward Father, but Father's disdain and disrespect for Mother manifested more as snide condescension or derision as opposed to anger.

*Id.* at 15, 19-20 (record citations omitted).

After our review, we find no relief is due to Mother. On Mother's third issue, contrary to Mother's claims, the court considered the bonds between Children as to each other, as between N.C.F. and Mother, and between M.F. and Children. *See* Trial Court Opinion, 9/15/25, at 7 ("To begin with, the oldest child, M.F.[,] is to be attending college this fall according to the testimony at trial. Whether she has left already or is soon to leave, the practical fact is that she is not actually living full-time with Mother and would not be there full-time to maintain a relationship day-to-day with her brother, [N.C.F.]"); *see also* Trial Court Opinion, 7/18/25, at 24 ("[Although] Children do not appear to have a *per se* negative relationship with one another, they do not have a well-developed bond."); Trial Court Opinion, 9/15/25, at 7 (N.C.F. has bond with Mother but also has one with Father). Further, as discussed in greater detail below, contrary to Mother's claims, the court explained why it separated Children. *See id.* at 8 (trial court concluding that,

"Given the exceptional level of conflict in this case and the tradeoffs the court had to make to reduce the opportunities for the parents to manufacture further conflicts with each other to the detriment of their children, this option was the least-damaging one the court believes it could implement."). Under the appropriate standard of review, this Court does not reweigh the factors already considered by the trial court. *See C.R.F.*, 45 A.3d at 443 ("our role does not include making independent factual determinations"). In any event, as discussed below, we find ample record support and compelling reasons for separating Children from each other, including the significant difficulties each parent experienced while parenting multiple of their children simultaneously, Children's intensive and specific behavioral needs including mitigation of their fighting, the opportunity to give each parent more time and attention to meet each individual child's needs, and the minimal bond that exists between Children. *See id.* ("We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court."). To the extent that Mother's arguments do not directly relate to her contention that the court did not consider the various family bonds, those claims are waived where she failed to specifically include them within this issue or a separate one in her Rule 1925 statement. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); *see also* Pa.R.A.P. 302(a). Accordingly, no relief is due on Mother's third issue.

Next, as to Mother's fourth issue, after reviewing the record, we conclude that the video-documented struggles that each parent exhibited when responsible for parenting multiple children more than supports the court's order and satisfies the requirement for compelling reasons to support separating siblings. *See Witmayer*, 467 A.2d at 376; *see also Pilon*, 492 A.2d at 60 (noting distinction between "good reasons" and "compelling reasons" and defining compelling as "tending to convince or convert by or as if by forcefulness of evidence"). Indeed, the trial court specifically found the recordings that Mother introduced were "compelling" evidence in intensity and substance where they demonstrated **both** parents' inability to provide an appropriate environment for caring for all their children when they were responsible for doing so, and after our review of the same, we agree. *See* Trial Court Opinion, 7/18/25, at 6 ("the court finds that the most[ ]compelling pieces of evidence apart from testimony in this case to be Mother's exhibits 9 and 11"); *id.* at 30 ("Both [parents] would engage in this household cold war in full view of the children and at times use them as props in fights."); Trial Court Opinion, 9/15/25, at 19 ("Mother was more interested in recording it all for her own use than protecting her adolescent daughter or the younger two children who were evidently witnesses to this slow[-]rolling catastrophe of parenting. Mother herself was recorded in the presence of the children during moments when she was considerably emotionally dysregulated, also while Father was not intervening himself."); *see also* Mother's Trial Exhibits 9 and 11. Further, the trial court found that Mother specifically had difficulty

parenting N.C.F., therefore rendering it more appropriate for Father to take responsibility parenting him most of the time. ***See*** Trial Court Opinion, 9/15/25, at 12 ("The court considered videos and recordings offered by Mother and Father showing interactions between [C]hildren and the parents, including ones where Mother was melting down or obviously frustrated, especially by [N.C.F.]"). Moreover, contrary to her claims, under the custody order, Mother was granted her relocation request, except that her request was granted within the context of the custody order[11]—under the appropriate umbrella best interest analysis, ***see S.S.***, 189 A.3d at 1098—rather than based on Mother's preferred outcome of full custody of both Children. ***See*** Trial Court Opinion, 9/15/25, at 8 (trial court noting that, "[B]oth parents cannot be accommodated to the extent they desire. That is the nature of the beast in custody court."). Although the facts of this case are rare or exceptional with regard to separating siblings for their best interests, ***cf. Witmayer***, 467 A.2d

---

[11] Specifically, Mother has custody time with N.C.F. every other weekend in her relocated home. Further, though unusual, we discern no abuse of discretion in the trial court's determination, under the facts of this case, that the reasons to separate Children were so compelling that Mother's relocation had minimal effect on the court's umbrella best interest analysis. ***See*** Trial Court Opinion, 9/15/25, at 9 ("For what it is worth, had mother moved into a house five miles down the road from Father instead of further across the Commonwealth, the schedule of physical custody in this case would have been identical.").

376—for at least a majority of the time[12]—the record in this case reflects that compelling reasons support the trial court's custody order separating Children where it is in both Children's best interests, and we conclude there is no abuse of discretion or error of law. *See C.R.F.*, 45 A.3d at 443. Therefore, Mother is not entitled to relief on her fourth issue.

In her fifth issue, similarly, we find there was sufficient record evidence, including the recordings of Mother's difficulties in parenting Children together, and N.C.F. specifically, as noted above, which warranted placing primary custody of N.C.F. with Father, in both Children's best interests, and we discern no abuse of discretion. *See C.R.F.*, 45 A.3d at 443. After our review of the record in this case, we find that the trial court correctly concluded that allowing each parent to focus the majority of their time and attention on only one child will ease the parenting burdens on both parties and is in the best interests of both Children. *See S.S*, 189 A.3d at 1098. As we find no abuse of discretion or error of law, Mother is not entitled to relief on her fifth issue.

Next, on Mother's seventh issue, we again find no relief is due. Although Mother chooses to specifically highlight Father's behaviors, we note that the trial court precisely based its decision on the best interest of Children, as is required. *See S.S*, 189 A.3d at 1098; *see also* Trial Court Opinion, 9/15/25, at 7 (trial court explaining it "analyzed all of the factors, gave reasoning for

---

[12] The trial court leaves room for the bond to improve between Children, especially insofar as Children are not entirely separated and will spend every weekend together. *See* Trial Court Opinion, 9/15/25, at 8.

each, applied weight to each, and assessed the overall case to come up with an outcome it felt suited the best interests of each child"). Further, we conclude that there was ample record evidence demonstrating that both Mother and Father severely struggled to parent their three children and attend to their respective emotional well-being, emotional safety, and other needs, especially when caring for multiple children, as discussed above. **See** Trial Court Opinion, 9/15/25, at 19 ("Mother was more interested in recording it all for her own use than protecting her [three] children [. . . similarly,] Father was not intervening himself."). In fact, on the issue of well-being and appropriate child development, there is record evidence of both Children "backsliding" in their behaviors and support for what the trial court observed at the trial—that K.A.F. continued to exhibit "willful" behavior—and Mother had responsibility for Children's care more recently. **See** Trial Court Opinion, 7/18/25, at 28 ("Even when the court was interviewing K.A.F. she demonstrated a very willful personality.").[13]

Also, the determination by the trial court that parents could not effectively parent Children simultaneously for significant periods of time was

---

[13] **See also** N.T. Trial, 7/9/25, at 23 (K.A.F.'s therapist, Kathryn Weber, testifying K.A.F. consistently shows moments of improvement and behavioral "backslides"); **id.** at 93 (Kathryn Weber testifying as to K.A.F.'s recent behaviors, stating "The only one that I have been able to observe that I do think is different is [K.A.F.]'s being more evasive and trying to enter the therapy room when it isn't[. . .] her turn. That is a new behavior for her as far as therapy is concerned."); **see id.** (Weber testifying K.A.F. exhibits aggression during behavioral backslides).

supported by the video and audio footage that contains recordings of each parent, recorded by the other, at times when each struggled to parent Children effectively. Undeniably, for Mother's recordings of Father's struggles, Mother chose to record the interactions instead of exiting and ignored Children when recording rather than attend to their needs when they sought her attention. **See** Mother's Trial Exhibit 11. For Father's recordings of Mother, the court characterized Mother's parenting of N.C.F. at one point as a meltdown but also noted Father wrongly remained a spectator in those moments. **See** Trial Court Opinion, 9/15/25, at 12, 19. As the court's findings of facts and conclusions of law are properly supported by the record evidence, there is no abuse of discretion or error of law.[14] Accordingly, Mother is not entitled to relief on her seventh issue.

In her eighth issue, which we address here, as no other portion of Mother's argument addresses this point, **see** Mother's Brief, at 27, we find the claim waived for lack of development because Mother fails to explain the abuse of discretion or error of law she raises beyond a mere bald claim of such, and Mother cites to no authority in support of her position that the trial court was required to consider the specific testimony at issue. **See In the Int. of R.H.**, 320 A.3d 706 (Pa. Super. 2024) ("Where an appellate brief fails to provide

---

[14] We must note that, while viewing the videos at trial, the court considered reporting these parents to proper authorities for their parenting failures as evidenced in the recordings: "You know, I am confronted with a [decision] right now[:] whether I have to report this as [a] mandatory reporter under 23 Pa.C.S.[ § 6303(b.1)], child abuse definitions." N.T. Trial, 7/9/25, at 134.

any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of this Court to formulate [an a]ppellant's arguments for h[er].") (citations, quotation marks, and brackets omitted). As we conclude that Mother failed to meaningfully develop this claim in her brief and her presentation of the issue materially impedes our review, we deem the claim waived.[15]

As it relates to the trial court's determination that Mother was not credible based on its direct observation of her testimony and demeanor across several proceedings, we conclude such a decision is supported by the record insofar as Mother denied that Children have behavioral issues in her home when the record plainly shows such issues existed and required additional specific attention. *See* N.T. Trial, 3/26/25, at 27 (GAL testifying "I think that these children have extreme behaviors. I think [K.A.F.]'s behaviors have calmed down. I am concerned about the escalation in [N.C.F.]'s behaviors."); *see id.* at 29 (GAL testifying that "The only reason [N.C.F.] is not hospitalized is because of his age and the fact that everyone thinks he's going through all of these things, so they're giving him grace."); *id.* at 31 (GAL testifying "I just don't believe mom when she says they're good kids at home because the reports are that they're beating each other at home, and [N.C.F.] is coming

---

[15] In any event, the court need only consider all the necessary factors, not every specific fact bearing on such factors. *See M.J.M.*, 63 A.3d at 336.

to school saying he's got scratches[,] and it's because [K.A.F.] hit him."); ***id.*** at 58 (GAL testifying and agreeing that "[Mother] had indicated to the [trial c]ourt that none of this ever happens in [her] house[,] and it only happens when [Father's] visits are coming up"); ***id.*** at 58-61 (GAL testifying that N.C.F.'s behavioral issues require significant attention and specific accommodations such that, *inter alia*, N.C.F. must depart school prior to end of school day every day because only person who can control him departs at that time and, further, Children's prior school asked N.C.F. to enroll in different school from K.A.F., whereas K.A.F. remained); ***id.*** at 62 (GAL testifying "[Children] are fighting in the home. Mother's acknowledged that to teachers, but that's really the only thing that I have heard or can confirm that she said negative is happening in the home."); ***id.*** at 73 (GAL testifying "[Mother] says at visits that [N.C.F.'s behaviors are only] attached to visits [with Father], [whereas] the records show that [N.C.F.'s] behaviors are always [his] behaviors."). Further, because the court had the benefit of presiding over several days of trial and other hearings on the instant topics with the instant parties, in this matter and in others, for years, the trial court was in the best position to determine credibility. ***See C.R.F.***, 45 A.3d at 443. We reiterate why the trial court, rather than this Court, should make credibility findings:

> We are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine

the credibility to be placed on each witness and, premised thereon, gauge the likelihood of success of the current permanency plan. Even if an appellate court would have [reached] a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

***Interest of K.C.***, 310 A.3d 296, 306 (Pa. Super. 2023). Accordingly, no relief is due on any of Mother's combined issues that she raised in the first portion of the argument in her brief. ***See*** Mother's Brief, at 17-51.

Next, we proceed to review Mother's second issue on appeal—that the trial court committed an abuse of discretion or error of law by stating that the ultimate determination of custody for Children would be based on the court's finding of whether Father sexually abused M.F., the parties' eldest child. ***See*** Mother's Brief, at 51-63. Specifically, Mother claims that the court found M.F.'s claims of abuse to be credible at a PFA hearing in December 2022, but, after the conclusion of the custody trial, found those same claims to be incredible. ***See id.*** at 53, 62-63. Mother notes that M.F.'s allegations were consistent at every stage of the proceedings. ***See id.*** at 54-55.

Mother argues the court "abused its discretion by accepting Father's 'defense' as proof positive that he didn't engage in the behaviors alleged by [M.F.] and basing the outcome of the custody trial regarding [C]hildren on that assessment." ***Id.*** at 55. Further, Mother highlights complaints she has with the adequacy of Father's turned-over discovery in the divorce proceedings in connection with his alleged abuse of M.F., and she also identifies inconsistencies regarding Father's testimony at the PFA hearings, to support her argument that Father committed the alleged abuse. ***See id.*** at

- 33 -

56-58. Moreover, Mother contends that sufficient evidence that Father was incredible exists in the record in the form of, *inter alia*, photographs of (1) Father and M.F. laying together on a couch where some of the alleged abuse occurred, and which Father claimed was impossible because he and M.F. could not both fit together on the couch at the same time, and (2) trips where the alleged abuse occurred, ostensibly establishing that Father, in fact, abused M.F. and lied about it. ***See id.*** at 59-60. We find no relief is due.

The trial court evaluated this issue as follows:

Simply put, the court is not going to award any significant custody of any child to any parent in any case if it concludes that there was proof to a preponderance of the evidence that the parent (repeatedly) sexually abused any of the children. Kayden's Law[16] certainly has a considerable impact on that as well as just plain common sense. Therefore, in this case, the sexual abuse issue was the single-most compelling issue to address at trial[, and t]o contend otherwise is simply absurd.

It is self-evident that there are sixteen[3] custody factors. All trial courts have been well-advised by our colleagues in the appellate courts in Pennsylvania that all the custody factors must be considered. In addition, assigning weight to the factors is an essential function. This court submits respectfully that if, as part

---

16 ***See*** Act of April 15, 2024, P.L. 24, No. 8 (known as "Kayden's Law"), effective August 13, 2024. By way of explanation:

Kayden's Law expands the factors to be considered in the custody court's best interest analysis and now requires the court to give "substantial weighted consideration" to, *inter alia*, the "safety of the child," which is defined in Kayden's Law as including "the physical, emotional and psychological well-being of the child," and any "violent or assaultive behavior committed by a party."

***Velasquez v. Miranda***, 321 A.3d 876, 886 n.6 (Pa. 2024) (citation and brackets omitted).

of the factors analysis, it concluded that one parent repeatedly sexually assaulted one or more children whose custody is at stake at a trial, that it would assign overwhelming weight to that factor. That would probably be the ballgame for practical purposes, even though the rest of the factors must still be analyzed and given weight.

> [3] There are more than sixteen following the enactment of Kayden's Law, but they are still numbered that way. This trial concluded prior to the simplification of those factors which became effective on August 29, 2025.

To the extent that [Mother] perceives the court's statement as "if the sexual assault allegations are unproved, she loses" that is not at all what the court did, and the record of the court's decision in the case makes that plain. Once the court resolved that the sexual assaults were not proved, it merely created the possibility that Father could obtain physical custody rights based on an ordinary evaluation of the remaining custody factors. The court then did this and analyzed all of the factors, gave reasoning for each, applied weight to each, and assessed the overall case to come up with an outcome it felt suited the best interests of each child.

It is hard to perceive how [the court's analysis] amounts to an error of law. The record clearly shows the court carried out its statutory mandate to evaluate the custody factors and to explain its decision fully.

Trial Court Opinion, 9/15/25, at 5-7; *see also* Trial Court Opinion, 7/18/25, at 15 ("The court formerly considered the testimony of [M.F.] fully credible in the absence of being challenged as to a narrative which evolved, allegations which were largely disproved, and a collateral witness (Mother) who later revealed herself to be thoroughly dishonest to the court about a material

matter. The court no longer regards Mother or [M.F.[17]] as reliable reporters of events.").

After our review, we discern no abuse of discretion or error of law in the court's analysis of the facts, or its attendant statement of how the custody factors should be weighed. *See C.R.F.*, 45 A.3d at 443. We agree with the trial court that, at least under the facts and assault allegations in this case, if the court concluded that Father repeatedly sexually assaulted any of his children, it would have assigned overwhelming weight to that factor such that it would be determinative in the factors analysis. *See* Trial Court Opinion, 9/15/25, at 6. Further, the trial court correctly pointed out that where Mother's claim might be construed as "if the sexual assault allegations are unproved, she loses," the trial court's opinion belies that claim, and that is not the trial court's analysis. *Id.* at 7 (trial court explaining that once court resolved alleged sexual assaults were not proved, it considered Father's physical custody rights based on evaluation of remaining custody factors, applying weight to each factor in Children's best interests). To the extent Mother asks this Court to reweigh the evidence, in reviewing this appeal under the appropriate standard of review, we will not do so. *See K.C.*, 310 A.3d at 306 ("we are not in a position to reweigh the evidence and the credibility

---

[17] In explaining its finding as to M.F., the court stated at trial, "I was confused at this case from the beginning as to why anybody would lie about their father committing sexual assault against them. And it's clear to me today that she had every reason to, because she found her father so intolerable[,] and he was so obnoxious and abusive to her." N.T. Trial, 7/9/25, at 234.

determinations of the trial court"). Moreover, insofar as Mother argues that Father is incredible and the alleged child sexual abuse should be considered as having taken place within the factors analysis, we have already determined that we will not disturb the credibility determinations given the trial court's immense time spent with the parties in this case and in other proceedings relating to these issues.[18] *See id.* Accordingly, no relief is due.

Last, Mother argues that the court should have allocated more time for her to put on her case in chief. *See* Mother's Brief, at 63. Specifically, Mother complains that the court permitted Father to use most of the trial time, Mother was prejudiced because the court "grossly" limited necessary testimony, and she forwent presentation of several witnesses altogether. *Id.* Mother contends that the difference in time allowed as between Mother and Father for presenting their claims to the court amounts to reversible error, especially where no limits were placed on Father's time, but limits were placed on Mother's. *See id.* at 63-64. Again, no relief is due.

After our review, insofar as Mother argues that the court placed unfair limits on her presentation of her case in chief, she fails to cite to any authority in support of her position. *See* Mother's Brief at 63-64; *see also* Pa.R.A.P. 2119(b). Indeed, even reaching the merits, we conclude that Mother is not entitled to relief because she failed to specify: (1) the identity of the

---

[18] There is record support for the court finding M.F. is incredible. *See* N.T. Trial, 7/9/25, at 200-01, 207-08 (Mother testifying on cross examination and agreeing that M.F.'s sexual abuse allegations changed over time).

witnesses; (2) what witness testimony she did not present due to limitations on her time; and (3) why that testimony was necessary or why the omission amounted to unfair prejudice. **See Calisto v. Rodgers**, 271 A.3d 877, 884 (Pa. Super. 2022) (*en banc*) (noting that, in challenges to evidentiary rulings, to amount to abuse of discretion or reversible error, error must be harmful or prejudicial); **see also Behr v. Behr**, 695 A.2d 776, 778 (Pa. 1997) ("This Court has long upheld a court's power to maintain courtroom authority."); **Yoskowitz v. Yazdanfar**, 900 A.2d 900, 906 (Pa. Super. 2006) (trial court judges have wide discretion in management and conduct of trial proceedings and appellate courts "are most careful not to second-guess trial court judges in the exercise of their discretion to so manage"). Therefore, Mother is not entitled to any relief.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/06/2026

- 38 -